UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------

*In re:*

ATARI, INC. et al.

*Debtor.*

Case No. 13-10176-jmp
New York, New York
January 24, 2013
10:39 a.m. - 12:13 p.m.

--------------------------------

TRANSCRIPT OF CHAPTER 11 MATTER, CASE 13-10176-JMP
- ATARI, INC., ATARI INTERACTIVE, INC., HUMONGOUS, INC.,
AND CALIFORNIA U.S. HOLDINGS, INC. -

FIRST DAY HEARINGS

(Proposed)
AGENDA

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER (I) DIRECTING JOINT ADMINISTRATION OF THE CHAPTER II CASES UNDER FED. R. BANKR.P. 1015(B), (II) WAIVING REQUIREMENTS OF 11 U.S.C. § 342(C)(L), FED. R. BANKR. P. 1005 AND FED. R. BANKR. P. 2002(N), AND (III) AUTHORIZING THE DEBTORS TO FILE REQUIRED MONTHLY OPERATING REPORTS ON A CONSOLIDATED BASIS [DOCKET NO. 2];

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER GRANTING THE DEBTORS ADDITIONAL TIME WITHIN WHICH TO FILE SCHEDULES AND STATEMENTS [DOCKET NO. 4];

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER ESTABLISHING NOTICE AND SERVICE PROCEDURES [DOCKET NO. 5];

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER (I) APPROVING THE FORM AND MANNER OF NOTICE OF THE COMMENCEMENT OF THEIR CHAPTER II CASES, (II) AUTHORIZING THE DEBTORS TO PREPARE A CONSOLIDATED LIST OF CREDITORS IN LIEU OF A MAILING MATRIX, AND (III) AUTHORIZING THE DEBTORS TO FILE A CONSOLIDATED LIST OF TOP 30 UNSECURED CREDITORS [DOCKET NO. 6];

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER (I) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES TO, OR DISCRIMINATING AGAINST, THE DEBTORS ON ACCOUNT OF PREPETITION INVOICES; AND (II) DETERMINING THAT THE UTILITY COMPANIES ARE ADEQUATELY ASSURED OF POST PETITION PAYMENT [DOCKET NO. 7]

AGENDA
(cont'd)

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (II) AUTHORIZING CONTINUED USE OF EXISTING BUSINESS FORMS, (III) ACCORDING ADMINISTRATIVE EXPENSE STATUS FOR INTERCOMPANY RECEIVABLES, (IV) WAIVING THE INVESTMENT AND DEPOSIT REQUIREMENTS OF SECTION 345 OF THE BANKRUPTCY CODE, AND (V) GRANTING CERTAIN RELATED RELIEF [DOCKET NO. 8];

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS; AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS [DOCKET NO. 9];

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO MAINTAIN A PREPETITION INSURANCE PREMIUM FINANCE AGREEMENT [DOCKET NO. 10];

MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY PREPETITION WAGES, SALARIES AND BENEFITS, (II) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY PREPETITION PAYROLL TAXES, WITHHOLDINGS AND REIMBURSABLE EXPENSES; (III) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO CONTINUE EMPLOYEE BENEFIT PROGRAMS ON A POST PETITION BASIS; AND (IV) AUTHORIZING ALL FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS [DOCKET NO. 11];

(CORRECTED) MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO INCUR POST-PETITION SECURED INDEBTEDNESS, (II) GRANTING FIRST PRIORITY PRIMING LIENS AND PROVIDING SUPER PRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING [DOCKET NO. 17]

BEFORE THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

```
 1   A P P E A R A N C E S :

 2   For Debtors:              MICHAEL P. RICHMAN, ESQ.
                               PETER P. PARTEE, ESQ.
 3                             Hunton & Williams LLP
                               200 Park Avenue
 4                             New York, New York 10166-0091
                               (212) 309-1000; (212) 309-1100 fax
 5
     For DIP Lenders:          ROBERT G. BURNS, ESQ.
 6                             Bracewell & Giuliani
                               1251 Avenue of the Americas, 49th Fl.
 7                             New York, New York 10020-1104
                               (212) 508-6155; (800) 404-3970 fax
 8
     For Atari SA and          KEN COLEMAN, ESQ.
 9   Atari Europe SA:          Allen & Overy LLP
                               1221 Avenue of the Americas
10                             New York, New York 10020-1104
                               (212) 610-6300; (212) 610-6399 fax
11
     For Blue Bay:             SCOTT GREISSMAN, ESQ.
12                             White & Case LLP
                               1155 Avenue of the Americas
13                             New York, New York 10038-2787
                               (212) 819-8567; (212) 354-8113 fax
14
     For Tenor Capital         HUGH M. MCDONALD, ESQ.
15   Management Corp. LP:      SNR Denton US LLP
                               1221 Avenue of the Americas
16                             New York, New York 10020-1089
                               (212) 768-6876; (212) 768-6800 fax
17
     For the U.S. Trustee:     RICHARD CHARLES MORRISSEY, ESQ.
18                             33 Whitehall Street, 21st Floor
                               New York, New York 10004-2112
19                             (212) 510-0500; (212) 668-2255 fax

20   Transcriber:             AAA Electronic Sound Reporters
                              1133 Broadway, Suite 706
21                            New York, New York 10010
                              (888) 866-5135; (888) 677-6131 fax
22                            electronicsound@court-transcipts.net

23        (Proceedings recorded by electronic sound recording)

24

25
```

In re Atari, Inc. et al - 1/24/13                                    4

1          THE COURT:  Be seated, please.  Good morning.  Mr.

2    Partee, how are you?

3          MR. PARTEE:  Good morning, Your Honor.  I am exhausted

4    but fine and I first of all want to say, may it please the

5    Court, for the record I am Peter Partee from Hinton & Williams,

6    LLP.  To my right is Michael Richman at the counsel table, also

7    with me from Hinton & Williams, LLP.

8          MR. RICHMAN:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         MR. PARTEE:  And we are proposed lead counsel for the

11   debtors and debtors-in-possession in these Chapter 11 cases.

12   Your Honor, first and foremost let me say thank you for the

13   indulgences this morning with the additional time.  I know that

14   the Court's time is limited this morning and I believe it has

15   borne fruit.

16         What we would like to do, Your Honor, with the Court's

17   permission, is go through a little bit of background leading up

18   to the change in DIP facilities that we effectuated last night.

19   We are effectively going to be changing from Tenor Capital as

20   our DIP lender to Alden Capital as our DIP lender on

21   substantially the same but vastly improved terms.

22         THE COURT:  That's good.  I'm interested in knowing

23   about that sooner rather than later, so rather than --

24         MR. PARTEE:  Understood, Your Honor.

25         THE COURT:  -- rather than start in the ordinary way

In re Atari, Inc. et al - 1/24/13                          5

1   which is to give me the deep background, of which I think I

2   already know from --

3           MR. PARTEE:  Fair enough.

4           THE COURT:  -- having read the materials, I'm most

5   interested in knowing what the new DIP terms look like and how

6   they compare and I would also like to have a chance to reflect

7   on them.  So, the sooner I have that, the better.

8           MR. PARTEE:  Absolutely, Your Honor.  And Your Honor

9   to that end, we do have a blackline of changes to the term

10  sheet, as well as a blackline of changes to the interim order

11  and a revised DIP budget to go along with that that we can hand

12  up at this time, if the Court would like to have them to review

13  as I go through the presentation.

14          THE COURT:  Sure.

15          MR. PARTEE:  We also have additional copies for

16  anybody who might be interested in the courtroom that hasn't

17  already received them with my paralegal on the end.  May I

18  approach, Your Honor?

19          THE COURT:  Sure.

20          MR. PARTEE:  Your Honor to characterize, first and

21  foremost, I think it's important to understand the process by

22  which all this occurred.  The company with -- essentially ran

23  into a liquidity crisis and that's explained in the first day

24  declaration commencing in early December therefore.  They

25  realized they would no longer be receiving financial support

1  from their publicly traded French parent and could no longer

2  move money within the consolidated corporate structure as and

3  where needed, as they previously had.

4         Therefore, the Atari U.S. subsidiaries, the four U.S.

5  subsidiaries were caught in a position where they had a finite

6  amount of money with which to find new financing and otherwise

7  solve on a more permanent basis their liquidity issues and those

8  liquidity issues historically had prevented them from fully

9  monetizing the historic gaming franchises that are owned by

10 Atari.  So this has been a continuing issue and it became acute

11 only in December when it became apparent no further funds would

12 be flowing from upstream from the French publicly traded parent.

13        As a result, the company went through a fairly

14 significant process, signed NDA's with a number of different DIP

15 lenders, gave due diligence deposits to two; Counsel RB Capital

16 and Tenor Capital, both of which went through due diligence.

17 Counsel RB Capital issued a commitment subject to due diligence

18 but it did not survive due diligence.  They did not make a final

19 offer.

20        As a result, the only offer of financing that the

21 debtors had available to them at the time they filed was the

22 Tenor Capital Management DIP.  That DIP gave the debtors exactly

23 the flexibility that they requested to effectively spend

24 approximately thirty days in bankruptcy, determining whether

25 there would be a stalking horse bidder for the company's assets

In re Atari, Inc. et al - 1/24/13                    7

1   or a plan sponsor, locking them up and commencing that process

2   and then having sufficient funds with which to complete that

3   process, whether it's a plan or a sale.

4            The Tenor Capital DIP on the downside was

5   extraordinarily expensive and that's obvious from the face of

6   it, Your Honor.  Multiple different kinds of fees, as well as a

7   contingent back-in exit fee that was a sliding scale of

8   percentages based upon the sale price -- the net sales proceeds.

9            THE COURT:  Has that term sheet, which I understand

10  became the model for what you're now going to be presenting with

11  Alden, been withdrawn?  Is it no longer an option or is the

12  Alden an alternative to a Tenor transaction which is available

13  if we lead to resort to such extraordinary and offensive terms?

14           MR. PARTEE:  Well, understood, Your Honor.  I --

15           THE COURT:  By the way, it is the single-most horrific

16  term sheet for a DIP I have ever seen, is not market standard,

17  and is something that even if there had been no objections, I

18  would never approve.

19           MR. PARTEE:  We suspected that might be the Court's

20  position, Your Honor, and again but for the fact that it was the

21  only game in town --

22           THE COURT:  Sometimes as I said to my clerks, rescue

23  financing that looks like this is not rescue financing at all.

24  The patient should die.

25           MR. PARTEE:  We understand that, Your Honor.  I'm sure

In re Atari, Inc. et al - 1/24/13                    8

1   to be candid that the employees at Atari and parties interested

2   in buying their assets substantially as a going concern perhaps

3   would disagree but fortunately, we're not presented with that

4   issue today.

5           THE COURT:  Good.

6           MR. PARTEE:  So, let's take it off the table.

7           THE COURT:  What I would really like to know is if the

8   Alden Global Distressed Opportunities Master Fund and Alden

9   Global Value Recovery Master Fund LP Turnpike, Ltd. --

10          MR. PARTEE:  I don't even know the name enough -- well

11  enough, Your Honor.  They surfaced last night at about 10

12  o'clock, so --

13          THE COURT:  I don't know if that's the right name.

14  I'm just reading the words I'm seeing on a page but I would like

15  to know what the terms are.

16          MR. PARTEE:  Yes, Your Honor.

17          THE COURT:  And I'm also concerned for notice purposes

18  that parties-in-interest have had an opportunity to examine and

19  react to these revised terms.

20          MR. PARTEE:  And, Your Honor, I think when we go

21  through them you'll understand that there probably is no notice

22  issue.  It's simply the Tenor DIP with absolutely no fees

23  whatsoever; none.  No origination.  No commitment.  No exit.  No

24  takeout, nothing; no fees at all.  So, it is a tremendous

25  improvement.  It is basically the Tenor DIP.  Instead of having

In re Atari, Inc. et al - 1/24/13                           9

1   three tranches of two million, one million and a final two

2   million available upon the filing of a sale or plan, it's simply

3   two million up front and three million at final approval

4   availability, subject to a DIP budget with no fees at all.  It

5   is the first time in my career we've swung 180 degrees, Your

6   Honor, from perhaps the most expensive DIP that I've ever been

7   presented with to the least expensive DIP that I've ever been

8   presented with.

9        The quid pro quo, Your Honor, you might ask, why in

10  the world would a DIP lender do such a thing?  It raises the

11  question of motive; why -- what is their takeaway from this?

12        THE COURT:  Perhaps it's a charitable organization.

13        MR. PARTEE:  Well, perhaps so, Your Honor.  I doubt it

14  for some reason.  I have a sneaking suspicion it's not.  Your

15  Honor, they are, we understand, considering if they have not

16  already, purchased the Blue Bay secured claim against the parent

17  which is secured or at least purportedly by a pledge of the

18  stock of each of the U.S. subsidiaries and also purportedly

19  secured by a lien on the Test Drive Unlimited Gaming franchise

20  owned by Atari, Inc.  And as part of the DIP, they are requiring

21  that the debtor waive any and all rights that the debtor, but

22  not a committee, might have to challenge that lien or any of the

23  collateral related to that lien.  That lien purportedly also

24  includes a lien on the intercompany accounts, the unsecured

25  claims purportedly owed by the U.S. subsidiaries to the French

In re Atari, Inc. et al - 1/24/13                    10

1   parent.

2          Again, the debtor is being asked, as a quid pro quo

3   for this feeless DIP to effectively delegate its fiduciary duty

4   to challenge those positions and they may or may not be subject

5   to challenge to a committee and to give the committee the

6   standard rights to use proceeds of the DIP up to a cap of I

7   believe it's 50,000 dollars that's been proposed, to investigate

8   those liens, to investigate those positions but not to use the

9   DIP to challenge them and to give them the standard, I believe

10  it's sixty days to perform that investigation and to determine

11  whether to challenge those positions.

12         We felt after the company went through a literally

13  agonizing six to seven hour process of determining whether on

14  the one hand a very expensive Tenor debtor that did not require

15  a delegation of these fiduciary responsibilities to a committee

16  was superior or a feeless DIP that did require the delegation of

17  these responsibilities to a DIP was superior.  And we

18  respectfully submit made a good faith business judgment and the

19  right one that the feeless DIP, the least expensive DIP I've

20  ever seen, combined with a standard delegation of responsibility

21  to a committee, the part -- the real fulcrum constituency here,

22  the party on the bubble, to investigate these liens and claims

23  and determine whether there is a challenge available to them.

24         THE COURT:  Let me as you a question in reference to

25  the terms of the Tenor DIP facility and what's been picked up by

In re Atari, Inc. et al - 1/24/13                    11

1   Alden as it relates to certain aggressive timing milestones in

2   the bankruptcy case itself.  There are some events that were to

3   have taken place on a schedule that I view as anywhere between

4   ambitious to wholly unrealistic and an investigation of liens

5   may or may not be possible, even with a 50,000 budget that to me

6   sounds incredibly lean, in the time that's available if the

7   milestones are still part of the transaction.  Have those

8   milestones been retained or modified?

9          MR. PARTEE:  They've been modified but retained;

10  retained in concept but with modified numbers, Your Honor.

11  Essentially we have a full 180 day DIP here and so we have a

12  plan that must be consummated within 150 days if we go the plan

13  route.  We think that's realistic.  120 is very doable in this

14  case; 150 gives us a little bit of land, yeah, a little bit of

15  leeway.

16         When it comes to a sale process, we have 105 days

17  effectively to get that done and I think that that is a

18  reasonable period of time and I would simply draw, for example,

19  a contrast to the somewhat comparable case of In Re: THQ in

20  Delaware which has received some notoriety about trying to

21  accomplish a sale on a very expedited time frame.  We are

22  obviously not pushing for anything remotely close to that here,

23  nor does the DIP require it.

24         THE COURT:  Okay.

25         MR. PARTEE:  So again -- and, Your Honor, we have, you

In re Atari, Inc. et al - 1/24/13                    12

1   know, for example 75 days to get a bidding procedures order

2   entered, as opposed to 45.  So, we really feel like we have a

3   full, you know, even, you know, it could be sixty day period to

4   look for a stalking horse if we choose to use a stalking horse.

5   There may be so much appetite in these assets that we don't want

6   to set the market with a stalking horse offer.  That is one of

7   the considerations that we're going to be determining over the

8   course of the next thirty days.  This DIP gives us substantial

9   additional flexibility to make that determination.

10          The other thing that I am going to draw to the Court's

11  attention that the DIP does, Your Honor, is give us the full

12  flexibility to pursue a plan process because we are the licensee

13  under a lot of licenses of copyrighted intellectual property and

14  as a result, if we do a sale here, we may have to get consents

15  from the licensors.  Whereas, under a plan, with just an

16  assumption and no assignment corresponding to that, we probably

17  would not.

18          And so there may be a significant advantage to the

19  plan process or at least knowing that that is an option in

20  negotiating those consents with licensors.

21          So again, this is -- neither the Tenor DIP nor the

22  Alden DIP is something that has gone without a substantial

23  amount of input from the debtor in terms of what the debtor's

24  minimum needs are.  Essentially, what Alden has done at our

25  request is to take the Tenor DIP and modify it in ways that are

1   only beneficial to the debtor with the one glaring exception

2   that I've indicated to the Court previously and that is the

3   waiver or the delegation is the better way to put it, of the

4   fiduciary duties to challenge the insider positions to a

5   committee and then funds under the DIP to investigate -- lean,

6   as the Court characterized them but still there, but without any

7   ability to use the proceeds of the DIP to challenge; a

8   relatively standard bargain struck in this context.

9          THE COURT:  What's the status of the Blue Bay claim at

10  this point?  Blue Bay through counsel filed objections to both

11  the Tenor DIP, now probably mooted by virtue of the new

12  transaction and also to the putative certain critical vendor

13  claims?  Are those objections all mooted?  Does Blue Bay

14  continue to have independent standing in the case or has Alden

15  picked up that position as part of their arrangement, presumably

16  to try to acquire this business?

17         MR. PARTEE:  I know that I am authorized to -- and Mr.

18  Greissman, who represents Blue Bay is in the courtroom here to

19  my left, to authorize -- to represent that those objections will

20  be withdrawn contingent upon approval of the Alden DIP.  I will

21  let Mr. Burns, who represents Alden speak for himself with

22  respect to whether the acquisition of the Blue Bay claim has

23  already occurred.  With that, I'll tender the podium.

24         THE COURT:  If it has, it's lightening speed but let

25  me find out what's going on.

In re Atari, Inc. et al - 1/24/13                          14

1          MR. BURNS:  Good morning, Your Honor.  Robert Burns,

2    Bracewell & Giuliani.  I'm here on behalf of Alden, the proposed

3    DIP lender.  I can confirm that my client has acquired the Blue

4    Bay debt that was referenced in the debtor's first day papers,

5    the signature pages for that acquisition were exchanged this

6    morning between the parties here in France.  If you have any

7    other questions, I'm happy to answer them, Your Honor.

8          THE COURT:  No, that's fine.

9          MR. PARTEE:  Thank you.  So, Your Honor, lightening

10   speed.  Sometimes these things happen that way.

11         I want to take two minutes of the Court's time to make

12   a few comments about Tenor and the role that they played in the

13   case.  Tenor -- without Tenor, we would be in a Chapter 7 case

14   and I recognize that the Court thinks that perhaps if that was

15   the only financing available to us, perhaps that would have been

16   the right approach.

17         THE COURT:  There was a risk that if you proceeded

18   with the Tenor DIP that there's where you would have ended up.

19         MR. PARTEE:  Understood, Your Honor.  We would have

20   been there anyway and we would not have had what was effectively

21   a stalking horse for a better DIP without them.  And as a result

22   of discussions with the current DIP lender this morning, as well

23   as Tenor who obviously feels relatively aggrieved at where they

24   wound up, the debtor and the DIP lender have agreed to support

25   and we will be filing a motion seeking this relief, to award

In re Atari, Inc. et al - 1/24/13                    15

1    Tenor a substantial contribution claim and I can allow, you

2    know, Mr. Burns or the Tenor Capital representatives that are in

3    the courtroom to describe the precise deal that has been struck

4    in that regard.  It's obviously subject to this Court's review

5    and approval but I simply wanted to express the debtor's support

6    -- strong support for that substantial contribution claim on the

7    record because I will say again without qualification, we would

8    not have gotten the Alden DIP on the terms that we did without

9    Tenor Capital standing there as a stalking horse on the terms

10   that it had.

11          THE COURT:  Okay.  This is the first day of a case

12   that we'll have more days to follow.

13          MR. PARTEE:  Yes, indeed.

14          THE COURT:  We're not sure yet how many.  I think it's

15   premature for us to be talking about substantial contribution to

16   a case that is in its infancy and I will simply note without

17   making any comments that should be viewed as indicative on how

18   the Court might rule with respect to this request for

19   substantial contribution, that in the ordinary course of

20   distressed lending in this community, it is a foreseeable

21   outcome that parties who overreach may be exposed to the risk of

22   losing a deal because the deal is simply not market standard.

23   This was not a market standard deal; offensive to the Court in

24   its terms and to ask for substantial contribution for bidding it

25   big is frankly another example of being a pig.

In re Atari, Inc. et al - 1/24/13                    16

1          MR. PARTEE:  I understand the Court's position, Your

2     Honor, and obviously it is premature to consider the issue and I

3     simply --

4          THE COURT:  And I am nothing, if not blunt.

5          MR. PARTEE:  This I know, Your Honor.

6          THE COURT:  Okay.

7          MR. PARTEE:  This I remember.  Your Honor, with that,

8     again the terms of the Alden Capital debtor are more lenient in

9     terms of their timelines.  They are -- it is a feeless DIP.  It

10    is not in any way negative relative to the Tenor DIP in any way,

11    except one and that is the delegation to a committee on the

12    terms that I've described of the right to challenge the Blue Bay

13    and parent positions.

14         Now that is a major give but with a committee around

15    to perform that fiduciary function, we believe it's an

16    appropriate one in this case.  And with that, Your Honor, again

17    we have gone through with the United States Trustee the interim

18    order and have resolved all of the U.S. Trustee's comments to

19    the order.  It is -- there are some changes to the blackline

20    that the U.S. Trustee requested but otherwise, I believe we have

21    a fully consensual interim DIP and as a result, Your Honor, I

22    can proffer -- obviously, Mr. Robert Mattes, who is the chief

23    financial offer of the company, his testimony in support of this

24    DIP.  I can proffer Mr. James Wilson, the CEO who is also in the

25    courtroom, both of whom would testify to everything that I have

In re Atari, Inc. et al - 1/24/13                    17

1   represented to the Court this morning about the process by which

2   the Alden DIP was negotiated and obtained and how much more

3   favorable it is to the debtor and its estate -- the debtors and

4   their respective estates than the Tenor Capital.

5            THE COURT:  We've taken all of this out of order --

6            MR. PARTEE:  Yes, we have.

7            THE COURT:  -- and it's because of the importance of

8   this to the case as a whole and the late-breaking development

9   that changed the nature of the hearing from the Court's

10  perspective.

11           MR. PARTEE:  Yes.

12           THE COURT:  But I think given the importance of the

13  case and its visibility --

14           MR. PARTEE:  Certainly.

15           THE COURT:  -- its visibility may actually be greater

16  than the importance of the case, that we --

17           MR. PARTEE:  That had occurred to me, Your Honor.

18           THE COURT:  -- that we give you an opportunity to set

19  the stage that you were trying to do when I interjected and

20  changed the order of play.

21           MR. PARTEE:  Fair enough.

22           THE COURT:  And so, before we get into offers of proof

23  in support of the DIP, I think we should restart the clock on

24  this and go to the beginning and give you an opportunity to put

25  this all in context.  In doing so, I had some particular concern

1   and it may be misplaced because I don't fully understand the

2   nature of the business dealings between the U.S. entities that

3   are in Chapter 11 and the French parent and the French

4   affiliates.

5            I think it would be of some value for me to have a

6   better understanding, to the extent you can portray that --

7            MR. PARTEE:  Certainly.

8            THE COURT:  -- as to the prepetition structures at

9   issue here and allay some of my concerns which may be

10  misplaced --

11           MR. PARTEE:  Okay.

12           THE COURT:  -- that there are issues that may be

13  visited upon this court later in which representatives of

14  foreign creditors may say we're here.  We have claims.  This was

15  all one business.  The structure should be disregarded and

16  whatever is to be distributed should be distributed equally and

17  ratably as if this were just one business.

18           So part of what I am interested in knowing about is

19  the integrity of a capital structure that based upon the first

20  day papers appears to have been one in which funds freely flowed

21  from Europe to the U.S. from the U.S. to Europe and corporate

22  niceties may not have been fully observed.

23           MR. PARTEE:  Well, I think we can address that, Your

24  Honor, and I certainly understand the Court's concern in that

25  regard.  I think it's on the face of this case for anybody who

In re Atari, Inc. et al - 1/24/13                    19

1   reads the first day declaration.

2         So, Your Honor, with that, I will simply give you the

3   background that the Court has requested and that I would have

4   had we not gone right into, appropriately, the DIP issues.

5         Your Honor, the debtors and debtors-in-possession in

6   these Chapter 11 cases are the U.S. subsidiaries, there are four

7   of them, of a publicly traded French parent, Atari SA.  The four

8   U.S. subsidiaries are the owners of and the operators of the

9   historic, iconic gaming franchises that go under the brand

10  Atari.  These include not only the iconic games that many of us

11  grew up playing; Asteroids, Pong, Centipede, et cetera, but also

12  a number of other franchises that some may not associate with

13  Atari such as the very valuable Backyard Sports franchise, or

14  the Test Drive Unlimited franchise.

15        The debtors monetize these franchises in a number of

16  different ways.  Historically, they've done so through retail

17  outlets, although that is a winnowing area of their business and

18  something they're shifting away from, as well as online, mobile

19  and then licensing.  Each of those different market segments

20  produces viable cash streams based on games produced out of each

21  of these franchises and new releases and every time there is a

22  new release, there's an uptick in cash and then it winnows down

23  and then there's a new release and then the cash winnows down.

24        Part of what we are in right now is in a position

25  where we're about to release some new games but we have winnowed

In re Atari, Inc. et al - 1/24/13                    20

1    down before in the way of cash proceeds from the prior games.

2    That happened at the same time of the situation that I described

3    earlier and that is historically, the companies did keep

4    rigorous intercompany accountings of movements of cash.  In

5    fact, there are intercompany loan balances and some of them are

6    accruing interest between the U.S. subsidiaries, a separate

7    account for each one and with Atari SA, the upstream parent, and

8    then some of the European subsidiaries of the upstream parent.

9         There is no problem segregating the company's

10   respective assets and liabilities.  That is not the issue.

11   Functionally, as in the case with many companies, they were an

12   integrated, happy family and if there was a need for money in

13   Atari Europe and Atari Interactive had that cash, there would be

14   an intercompany loan booked to that company to effectively, you

15   know, pay the debt and/or vice versa.  So, in other words, they

16   kept rigorous accounting of where the cash flowed but where cash

17   was needed, that's where cash went.  And sometimes it would be

18   flowing downstream and sometimes it would be flowing upstream.

19        In the most recent months, there was -- it was not

20   flowing anywhere.  In the beginning of December, the companies I

21   think realized that they were maybe not insolvent but an

22   insolvency or near insolvency related positions and I think

23   everybody realized, all the officers and directors, realized

24   that it was no longer feasible from a fiduciary prospective to

25   move cash beyond where it sat at that moment.  Essentially,

In re Atari, Inc. et al - 1/24/13                          21

1   there was a cash freeze instituted.

2          That left the U.S. subsidiaries where all the

3   operations really are located and where all the valuable and

4   most of the intellectual property is owned, certainly the

5   historic stuff, without enough cash to continue for a period of

6   more than approximately six to eight weeks.  We projected that

7   we would make it to the middle of January without some form of

8   bridge financing and without some form of DIP.

9          The company then engaged in the search for DIP

10  financing or bridge financing by making inquiries with a number

11  of different lenders.  The issues presented were, Your Honor, as

12  the Court understands, this was a small loan.  We were

13  requesting five to ten million dollars in the form of a loan and

14  we -- you know, were in a lull cash-wise and were in a

15  distressed situation and as a result, not surprisingly, the

16  lenders we spoke to were universal in saying they would only be

17  willing to lend on a debtor-in-possession financing basis.  And

18  only as a bridge to either a sale or some of them were willing

19  to do so via a plan and then only after due diligence.

20         And as each of Mr. Mattes and Mr. Wilson would testify

21  if called, (a) everything I've just said is correct and (b) they

22  engaged in this process in good faith but did not have

23  sufficient funds to give more than a couple of the most

24  promising lenders, due diligence deposits.  If we had given

25  everybody due diligence deposits to do what they wanted to do,

In re Atari, Inc. et al - 1/24/13                    22

1    we would have been out of cash that day.

2            So we chose the two most promising lenders and that

3    was Counsel RB Capital and Tenor Capital to do significant due

4    diligence.  We also at the same time were negotiating with a

5    particular strategic potential investor, one who believed that

6    they would and had expressed a desire to provide both DIP

7    financing, as well as be the stalking horse bidder, a typical

8    bargain.  And with a strategic fit, it seemed like a wonderful

9    thing.  So, simultaneously while we were in negotiations with

10   the strategic, the two DIP lenders were doing their due

11   diligence; one called in FTI to do their due diligence, one

12   called in Sherwood Partners, well-recognized financial advisory

13   firms to do significant due diligence.

14           One week before bankruptcy, the strategic potential

15   investor DIP lender walked away from both potential positions.

16   They said they did not want to provide the DIP financing and

17   even if someone else provided the DIP financing, they did not

18   want to be the stalking horse lender.

19           This left us in a bit of a lurch and only having two

20   DIP lenders spending their due diligence, trying to play one off

21   the other in order to get the best deal.  Unfortunately, Counsel

22   RB Capital who had issued the commitment earlier, subject to due

23   diligence, ultimately did not make a binding proposal based on

24   the results of their due diligence.  We were surprised and

25   unpleasantly so by that result.

In re Atari, Inc. et al - 1/24/13                    23

1          As a result, we were left with negotiating with Tenor

2    and shockingly enough, what we wound up with, with Tenor was not

3    the initial ask.  We did actually make some progress negotiating

4    them downward to reach the DIP facility that we filed.  But it

5    was something that gave us the flexibility, which not too many

6    other lenders that we had spoken with gave us, to spend up to

7    thirty days or so in bankruptcy, trying to identify a stalking

8    horse lender, rather than simply commencing an immediate naked

9    auction.

10         As a result, the -- as Mr. Mattes in particular would

11   testify and as recounted in this first day declaration, the

12   company concluded that the tenor DIP was the only appropriate

13   route to follow.  It was the only game in town and that the

14   authorization to me was negotiate as best we can but get it,

15   cinch it, pay the commitment fee and get it done.  We didn't

16   have any money with which to pay the commitment fee, so they had

17   to accrue their commitment fee.  That was a negotiation.

18         It was done.  We did accrue the commitment fee by

19   signing the commitment outside of bankruptcy, Your Honor, and

20   that was 250,000 dollars, which is part of what relates to our

21   substantial contribution discussion earlier.

22         That being said, we proceeded into bankruptcy after

23   having received the, not only board votes in favor of the

24   filings and the Tenor DIP but also a shareholder resolution to

25   that effect.  So, we had the full support of the corporate

1 | parent for doing what we were doing.  There were lots of last

2 | second efforts to provide -- to obtain money at the French

3 | parent company level, so as to forgive the colloquialism, drip

4 | some down to the U.S. subsidiaries in a manner that would stave

5 | off the necessity of filing for bankruptcy.  Those simply did

6 | not come to fruition in sufficient time.

7 | What is the compelling time?  We have payroll that we

8 | have to fund no later than Monday, Your Honor and we lack

9 | sufficient funds with which to do so.  That is the urgency, as

10 | Mr. Mattes will testify if called, for funding the DIP.  We

11 | would need up to the two million dollar mark for a six week

12 | period.  If we go to a final hearing within two to three weeks,

13 | we can live on 1.4 to 1.5 million of an initial interim

14 | facility.  And we can have Mr. Mattes correspond that to the DIP

15 | budget that we proposed but that's essentially what it provides.

16 | I'm summarizing for the sake of expediency.

17 | With that interim draw, Your Honor, we would be able

18 | to both fund our payroll; get to a final hearing; as well as

19 | make the critical vendor payments to which there is now no

20 | objection from Blue Bay, as a result of taking the Alden DIP.

21 | And obviously, we'll get to that motion.  Mr. Richman will

22 | handle the proffer of evidence when it comes to that because we

23 | understand the sensitivity, of course.  On that note, I will say

24 | I absolutely detest critical vendor trade motions and I think

25 | they're the enaphthma^34:20 of the Bankruptcy Code but in this

1   case, we were compelled to move for that relief here, simply

2   because of the importance of those vendors and the role that

3   they play in the value of the company's games.  Again, Mr.

4   Richman will elaborate on that when we get to that point in the

5   presentation, Your Honor.

6        THE COURT:  We'll get to that in just a little bit.  I

7   still have some more questions that relate to the French parent

8   and also to how that enterprise is being managed at this point,

9   if there is a bankruptcy trustee --

10       MR. PARTEE:  There is not, Your Honor.  There's not.

11  My --

12       THE COURT:  Let me just ask a couple of questions.

13       MR. PARTEE:  Certainly.

14       THE COURT:  Under the arrangements with Tenor, and it

15  may be that these were not imposed by Tenor but simply part of

16  the debtors own bankruptcy planning, I understood that officers

17  that had been common to the French parent and the U.S.

18  subsidiaries were going to resign their positions in France,

19  leaving, it seemed to me, the French parent without leadership.

20  Is there anybody leading the French parent at the moment?

21       MR. PARTEE:  Yes, Your Honor.  First and foremost, the

22  only resignation that has occurred -- they were tranched; the

23  chief financial officer, Robert Mattes, who actually was --

24  there was never an official appointment of him being the CFO of

25  the French parent but certainly performed that function has

In re Atari, Inc. et al - 1/24/13                    26

1   resigned whatever position he may have had functionally or

2   otherwise with the French parent.

3         THE COURT:  By the way, that's just one of those facts

4   that doesn't help me very much --

5         MR. PARTEE:  I understand.

6         THE COURT:  -- when it comes to dealing with --

7         MR. PARTEE:  I understand that.

8         THE COURT:  -- the European creditors.

9         MR. PARTEE:  But it is what it is, Your Honor, and I

10  want to be candid about the facts.

11        THE COURT:  I understand.

12        MR. PARTEE:  But there is a controller that has been

13  placed into the CFO position in France.  Again, the French

14  parent company doesn't have -- it is a holding company.  It does

15  not have the kinds of operations on a day-to-day basis.  It does

16  not attempt to monetize games and market them and have an

17  ongoing day-to-day business in the way that the U.S.

18  subsidiaries do.  I'm sorry if that was not clear.

19        THE COURT:  There are French operating subsidiaries,

20  are there not?

21        MR. PARTEE:  There are French -- I believe there's one

22  Atari Europe SA and then there's something called Eden.  There

23  are a couple of different subsidiaries that are operating but

24  they have their own kind of sub-management groups.

25        THE COURT:  Okay.  So, just to get to it, what's

In re Atari, Inc. et al - 1/24/13                    27

1   happening in France?  Who is running the show?

2            MR. PARTEE:  And, Your Honor, right now Mr. Wilson,

3   Jim Wilson, is both the CEO of the U.S. subsidiaries, as well as

4   the French parent, although the contemplation is that a CRO will

5   be appointed and -- before the final hearing of the DIP in this

6   case and that at that point, Mr. Wilson will resign if that

7   doesn't occur earlier from that position.

8            THE COURT:  Just so the record is clear on this and so

9   that I am clear on this --

10           MR. PARTEE:  Yes.

11           THE COURT:  -- he'll resign from which position --

12           MR. PARTEE:  I'm sorry.

13           THE COURT:  -- and the CRO will be appointed in which

14  case?

15           MR. PARTEE:  In the -- he will resign from his

16  position with the French parent.

17           THE COURT:  And the CRO will be appointed in France?

18           MR. PARTEE:  A CRO will appointed in France to take

19  the position --

20           THE COURT:  I have no idea, what's French for CRO?

21           MR. PARTEE:  My apologies, Your Honor, chief

22  restructuring officer.

23           THE COURT:  No, I understand that.  I didn't know that

24  that --

25           MR. PARTEE:  Au francais.

1        THE COURT:  -- that function actually existed in

2    French bankruptcy.

3        MR. PARTEE:  You know, Your Honor, it's simply

4    somebody to come in and run the company during its process but I

5    don't know that there is a formal title in that respect but that

6    is the way it's being described to me.  And with that, Your

7    Honor, I mean, Mr. Ken Coleman, from Allen & Overy is here in

8    the courtroom, represents the parent and he may be much better

9    versed than I on these matters.

10       THE COURT:  I suspect he may be.

11       MR. COLEMAN:  Good morning, Your Honor.  Ken Coleman

12   of Allen & Overy.  And sorry to disappoint you, Your Honor, I'm

13   not that much better versed.  We haven't been involved for very

14   long in this process.  We represent Atari SA, the publicly

15   traded French company and Atari Europe SAS.  We've been involved

16   for less than a week.  I think Mr. Partee parties know a bit

17   more about what's been happening since his involvement predates

18   ours by some months.

19           What I do know is that Atari SA and Europe SAS have

20   filed applications for safeguard proceedings in Paris.  That

21   does not constitute the commencement of a case as we would know

22   it or as Your Honor would know it from other foreign proceedings

23   that you've had here.  The commencement would occur after the

24   entry of an order by the Court in Paris.  There was a hearing

25   scheduled for Monday of this week that was adjourned until I

In re Atari, Inc. et al - 1/24/13                    29

1    believe Monday of next week and I'm not quite sure what is going

2    to happen today and tomorrow with respect to that.  So, the

3    company in France or the companies in France are still in that

4    period known conciliation.  There's a conciliator that has been

5    appointed that interfaces with the company and creditors in an

6    effort to reach some kind of arrangement.  That has not

7    occurred.  You know, there's been no plan as of yet.

8           As far as leadership of the company, Mr. Partee is

9    correct that the CEO is still on board at the parent company, as

10   well as in the U.S.  It is expected that he will resign in

11   France and there's a search underway for someone to replace him

12   that role in France.  I don't know that somebody has been

13   selected finally for that position but it is something that is

14   being dealt with as we speak in Paris.

15          THE COURT:  And that individual, once identified and

16   assuming such an individual is engaged, will then become your

17   client --

18          MR. COLEMAN:  Would then become --

19          THE COURT:  -- your client contact --

20          MR. COLEMAN:  Would then become the officer of our

21   client; correct.

22          THE COURT:  And while it may be premature to get into

23   this, is it contemplated that the French proceeding, assuming it

24   is -- it ripens into a full French insolvency case, will be the

25   basis for commencing a Chapter 15 case here?

In re Atari, Inc. et al - 1/24/13                    30

1        MR. COLEMAN:  It's entirely possible, Your Honor.

2        THE COURT:  And --

3        MR. COLEMAN:  This is -- this whole thing has been

4    sort of a bankruptcy version of Pong in a lot of ways, you know,

5    at least from where we've been sitting.  You know, who is

6    providing the DIP?  We don't know.  You know, who is in charge

7    here?  We don't know.  So, it's been evolving at a fairly rapid

8    clip.

9        So, I don't want to make representations to this court

10   that I am not entirely comfortable with, so Chapter 15 has been

11   discussed but until we actually file it before Your Honor --

12       THE COURT:  Understood and I'm not asking you to make

13   representations as to what may not happen.  I'm simply asking

14   whether or not that's something that might happen.

15       MR. COLEMAN:  It may well, Your Honor, and to be

16   perfectly candid with Your Honor as we always try to do, it has

17   been discussed at length.

18       THE COURT:  Okay.  Now to get to what's really

19   bothering me about this and why I raised the issue in the first

20   place, I'm trying to get a sense and it may be premature to

21   derive any such sense, as to whether the French entity is friend

22   or foe in a U.S. proceeding.  I'm trying to get a sense as to

23   whether French creditors through a foreign representative

24   perhaps, might be taking positions with respect to distribution

25   rights in this case or whether or not they'll simply be watching

1    from Paris.

2              MR. COLEMAN:  I understand.  I heard Your Honor's

3    question loud and clear earlier.  I don't really know the answer

4    to that.  I do know that the French company and I think Mr.

5    Partee's description was in very broad terms, accurate.  The

6    French parent has supported the subsidiary in a fashion that I

7    believe to be common to many corporate groups over the years.

8    They have substantial claims, intercompany claims.  We believe,

9    because there's a UCC-1 on file that at least a portion of those

10   claims are secured claims.  We did read in the cash management

11   order and, you know, we're looking at this in a lot of ways as

12   strangers to the situation as much as Your Honor is and some of

13   the other parties here, the -- you know, statements to the

14   effect that there are complex intercompany transactions, cash

15   moving throughout the network.

16             We have had some difficulty, given the activity that's

17   been taking place in France in terms of the safeguard

18   proceedings and the conciliation and really efforts to sure up

19   the parent's financings through third-parties, that we have not

20   been able to get our hands around necessary documents for us to

21   -- as Allen & Overy, to form a view on some of the issues that

22   are concerning Your Honor.

23             So, I don't know, is the answer to your question,

24   whether creditors elsewhere think this is a single enterprise

25   and therefore, they're entitled to assert claims in this

1   proceeding.

2        The parent being a public company, does file publicly,

3   financial statements.  There is in that respect a publicly

4   available delineation between the French and other entities and

5   the U.S. operations.  Atari in the U.S. has a history that

6   predates French involvement.  And those are just sort of public

7   facts that are out there.  What they distill to ultimately, we

8   don't have an answer to that just yet, I am sorry to say.

9        THE COURT:  It's helpful.  Thanks for the summary.

10       MR. COLEMAN:  Okay.  You're welcome.

11       MR. PARTEE:  Your Honor, in terms of the friend or foe

12  question, which I think is the first and foremost concerning

13  driving the Court's questioning here, one of the advantages of

14  the Alden DIP is that it obviously resolves the hostilities with

15  Blue Bay and just to be clear, Blue Bay is the parent's secured

16  creditor and purports to have a lien on all of the shares of the

17  U.S. subsidiaries, all the common stock, as well as the Test

18  Drive Unlimited franchise owned by Atari, Inc.

19       By virtue of resolving the hostilities with Blue Bay,

20  we may very well have resolved any potential hostilities with

21  the French parent again, because Blue Bay holds this -- I think

22  it's a 21 million dollar -- excuse me, 21 million Euro claim

23  against the French parent, secured by its lien on these shares

24  and punitive lien on the Test Drive Unlimited franchise and that

25  facility is in default, albeit it they've I think put it in a

In re Atari, Inc. et al - 1/24/13                                    33

1    forbearance period.

2           So again, it may be that the real party-in-interest

3    perhaps used to be the parent company but is really now Blue

4    Bay, as a result of their secured position and again, we've

5    tried to through the current Alden DIP, chip away at that

6    potential expense creating hostility by choosing the Alden DIP.

7    Now creditors clearly are going to have a say about all of that

8    as well but again, we felt like it was an unnecessary level of

9    hostility and contentiousness in this case that we were able to

10   take away and we may have eliminated it vis-a-vis the parent is

11   the point, as well --

12          THE COURT:  Okay.

13          MR. PARTEE:  -- as a result of Blue Bay's claim.

14          THE COURT:  Well, I think we've probably dealt with my

15   international concerns enough at this point but I do have a

16   question about anticipated professional engagements and when

17   those are likely to occur.

18          MR. PARTEE:  Yes.

19          THE COURT:  And my understanding was that under the

20   Tenor DIP there was a requirement that an investment banker be

21   engaged within I think five days.

22          MR. PARTEE:  Yes.

23          THE COURT:  I assume that some professional support

24   will be required to market the assets and maximizes value and

25   that someone or some firm has been identified and not yet

In re Atari, Inc. et al - 1/24/13                    34

1    revealed.

2            MR. PARTEE:  We are conducting our interviews this

3    afternoon of the two finalists, Your Honor.  FTI is one and Duff

4    & Phelps is the other.  And we believe both have the media savvy

5    and expertise necessary to do the work, the rolodex, as it were.

6    And, you know, again we're going to be conducting interview.

7            Now we did, as the Court knows, just last night lock

8    up a new DIP lender and they may have a say about someone else

9    they would like us to interview and we have not yet had that

10   discussion honestly.

11           THE COURT:  Sure.  So, I assume this is going to be on

12   a fast track.

13           MR. PARTEE:  Yes, indeed.

14           THE COURT:  Is the five-day requirement still part of

15   the deal?

16           MR. PARTEE:  I mean, it is, Your Honor, but I think

17   that's simply because Alden adopted the form of Tenor DIP and I

18   suspect Mr. Burns would represent on the record that, in fact,

19   that five business day period is not necessarily part of the DIP

20   if we don't want it to be but I will leave that to him.

21           THE COURT:  And can we also confirm just because it's

22   I know, an important hot button issue, that the lien on

23   avoidance actions that have been part of the Tenor DIP is no

24   longer part of the DIP?

25           MR. PARTEE:  Well, I will let Mr. Burns speak to that.

In re Atari, Inc. et al - 1/24/13                    35

1       MR. BURNS:  Thank you, Your Honor.  On the first

2  point, Your Honor, the five-day, I believe is still in there in

3  terms of the requirement to retain an investment banker.  That

4  is not sacrosanct by any sense.  It was really meant to I think

5  indicate that we do want this to move forward quickly.  We're

6  happy to modify that but we'll certainly be working with the

7  debtors on that.

8       Your Honor, I am going to -- if you could allow me

9  just to take a look at the order, I believe under the interim

10 order as it relates to liens on avoidance actions that is not a

11 lien from the interim period to the entry of a final order but I

12 would like to confirm that.  We were working on this very late

13 last night and my partner, Mr. Schulter --

14       THE COURT:  Okay.

15       MR. BURNS:  So --

16       THE COURT:  Thank you.

17       MR. BURNS: -- thank you, Your Honor.

18       MR. PARTEE:  And, Your Honor, I just --  I don't know

19 whether they're going to press the avoidance action issue at the

20 final hearing but for the interim hearing, it's not on the

21 table.

22       THE COURT:  Okay.  So that's a fight for another

23 day --

24       MR. PARTEE:  Precisely.

25       THE COURT: -- if it's a fight at all.

1        MR. PARTEE:  Precisely.

2        THE COURT:  Okay.

3        MR. PARTEE:  So, with that, Your Honor, again I'll

4    simply re-proffer the testimony of Mr. Rob Mattes who is now the

5    CFO of the U.S. subsidiaries with respect to the representations

6    made by me here to the Court today.  He will --

7        THE COURT:  So, just so it's clear, Mr. Mattes has

8    already submitted a declaration in support of first day motions

9    including the original Tenor DIP.

10       MR. PARTEE:  Correct.

11       THE COURT:  And your proffer is to supplement that

12   declaration through testimony he would otherwise offer as a live

13   witness here today to indicate that what you've represented with

14   respect to the Alden DIP, in fact, would be his own testimony,

15   were he needed to be called as a witness.

16       MR. PARTEE:  Correct.  If called, he would testify to

17   what I have represented, perhaps in not exactly the same words

18   but the concepts and the meaning would be the same.

19       THE COURT:  Okay.  Is there any objection to my taking

20   Mr. Partee's representations of what Mr. Mattes would otherwise

21   have said as the functional equivalent of testimony in support

22   of today's DIP?

23       MR. MORRISSEY:  Good morning, Your Honor.  Richard

24   Morrissey for the U.S. Trustee.  The U.S. Trustee has no

25   objection.  I just wanted to point out as just a purely

1   technical matter, that there's no actual motion accompanying the

2   new DIP.  There is a motion for the Alden DIP but again, that's

3   a purely technical matter.  The U.S. Trustee has no objection to

4   the idea of a proffer in lieu of a new declaration for the first

5   day.

6              THE COURT:  All right.  I'm going to treat the events

7   of the last -- I'm not sure how many hours -- let's call them

8   twelve hours --

9              MR. PARTEE:  Twelve, yes.

10             THE COURT:  -- as sufficient cause to modify the

11  currently filed and noticed motion to approve the Tenor DIP as

12  functionally equivalent to a restated motion to approve the

13  improved Alden DIP and would find that there is no need to file

14  an amended motion for these purposes because the record today

15  speaks for itself.  The motion for DIP approval now only relates

16  to Alden and no longer relates to Tenor.

17             MR. PARTEE:  Correct, Your Honor, just for the record.

18             THE COURT:  All right.  There's no objection to the

19  proffer.  The proffer is accepted.  Is there any other proffer?

20             MR. PARTEE:  Not with respect to the interim DIP

21  borrowing request, Your Honor.  Again, we do need to tender Your

22  Honor a revised order that incorporates Mr. Morrissey's comments

23  and we will work to do so before we leave the courtroom today.

24             THE COURT:  Okay.  Now there are any number of people

25  in the courtroom.  Are there any parties who wish to be heard

In re Atari, Inc. et al - 1/24/13                    38

1  with respect to the DIP facility?

2           MR. GREISSMAN:  Good morning, Your Honor.  Scott

3  Greissman, White & Case.  The representation made earlier that

4  the Blue Bay interests have been transferred to Alden are

5  generally correct.  The documents have been signed.  The

6  transaction has not yet closed.  It should close in the next day

7  or so.  So, hopefully, you won't be seeing me again but there

8  is, I guess some chance that if the deal doesn't close, I can't

9  imagine why that would be, but I just wanted to clarify the

10  representation made on the record in that regard.

11          And as far as the order is concerned, as a result of

12  the transaction not closing, we requested and the debtor's

13  agreed to as did the Bracewell firm that we could have an

14  opportunity this afternoon just to review it make sure if there

15  was anything problematic in it, we could alert them to any

16  changes and then the order would be filed.

17          THE COURT:  Okay.

18          MR. GREISSMAN:  Thank you.

19          THE COURT:  Fine.

20          MR. COLEMAN:  Your Honor, Ken Coleman, Allen & Overy.

21  Likewise with respect to the order, we've had a chance to look

22  through it a bit this morning.  We would like an opportunity

23  after the hearing to do so.  We noted just a couple of things in

24  terms of the identity of the French entities referenced in the

25  order.  Atari Europe SAS should be named in there as one of the

In re Atari, Inc. et al - 1/24/13                    39

1   French affiliates.

2          The amounts stated, I think are roughly correct,

3   although they need to be allocated between the two entities.  I

4   think, you know, important but not critical changes to the

5   order.  We would like an opportunity to look at it and provide

6   comments to the company and the DIP lender.

7          THE COURT:  Okay.

8          MR. COLEMAN:  Thank you.

9          THE COURT:  I'm confident that everybody who requests

10  will have an opportunity to review the order.

11         MR. PARTEE:  We will make it so, Your Honor.

12         MR. COLEMAN:  Fine.

13         MR. MORRISSEY:  Your Honor, once again, Richard

14  Morrissey for the U.S. Trustee.  I don't know if the Court wants

15  to hear the comments that we had but since they're -- it's not

16  necessarily from my perspective because the debtor has agreed to

17  make the changes that I've requested.

18         My question for the Court though is it's all together

19  possible that the Court itself upon reviewing the documents, may

20  have its own comments to make and just procedurally, how -- what

21  I am guess I am asking is how would the Court like to handle

22  that in terms of exchanging that information among the parties?

23         THE COURT:  I'm not understanding you, Mr. Morrissey.

24  I assume that the parties will work out the form of order that

25  includes to the extent you're able to agree, all of your

1  comments and I'll be receiving as I often do, an agreed form of

2  order.  I will either enter the agreed form of order in that

3  form or if I have tweaks of my own, I'll make those tweaks and

4  once I enter the order, that's it.  And if it's not an order

5  that the lender is prepared to lend under, that's too bad.

6         MR. MORRISSEY:  Okay.  Very well, Your Honor.  Thank

7  you.

8         THE COURT:  By the way, I've never had a problem.

9  I've never had an order in the form that I have chosen to enter

10  it not be deemed acceptable by the lender.

11        MR. PARTEE:  Funny how that works, isn't it, Your

12  Honor?  Your Honor, with that, we would conclude our

13  presentation with respect to the interim DIP order and

14  respectfully request entry of the order that we tender later

15  today after an opportunity to solicit comments from all

16  interested parties.

17        THE COURT:  That's fine.  This is, to say the least,

18  an unusual procedure.  The DIP as modified in accordance with

19  the representations made on the record is approved subject to

20  language to be agreed upon and ultimately approved by me.

21        MR. PARTEE:  Thank you very much, Your Honor, and with

22  that, I'll tender the podium to Mr. Richman who will handle the

23  balance of the agenda.

24        THE COURT:  Fine.

25        MR. PARTEE:  Thank you.

In re Atari, Inc. et al - 1/24/13                    41

1        THE COURT:  Thank you very much, Mr. Partee.

2        MR. PARTEE:  Thank you very much.

3        MR. RICHMAN:  Good morning, Your Honor.

4        THE COURT:  Good morning.

5        MR. RICHMAN:  Michael Richman, Hinton & Williams,

6   proposed counsel for the debtors.  Your Honor, if it's

7   convenient for the Court, I'll just follow the order of the

8   agenda without --

9        THE COURT:  That would be fine.

10       MR. RICHMAN:  Okay.  The first motion on the agenda

11  for today is a standard motion for joint administration, Your

12  Honor.  I would proffer paragraphs 29 to 32 of Mr. Mattes' first

13  day declaration for relevant facts in support.  We did agree in

14  response to a request from Mr. Morrissey that while we propose

15  to file consolidated operating reports that disbursement reports

16  would be broken out separately.

17       THE COURT:  Mr. Morrissey, is it acceptable?

18       MR. MORRISSEY:  Yes, it is, Your Honor.

19       THE COURT:  Joint administration is approved.

20       MR. RICHMAN:  Thank you, Your Honor.  The second item

21  on the agenda is the debtor's motion for an order to grant

22  additional time to file schedules.  We're asking only for thirty

23  days beyond the normal fourteen days provided by the rule, Your

24  Honor, so that we can try to sort through and deal with the

25  complexities of the records with all the other case pressures

In re Atari, Inc. et al - 1/24/13                    42

1   that we have and I would request that that be approved and also

2   just for the record, Mr. Mattes' declaration, paragraphs 40 to

3   42 speaks to that.

4           THE COURT:  Is there any objection to that?  I hear

5   nothing.  It's approved.

6           MR. RICHMAN:  Thank you, Your Honor.  The next motion,

7   number 3 on the agenda, is for the entry of an order to

8   establish notice and service procedures.  Paragraphs 33 to 35 of

9   Mr. Mattes' declaration, I would proffer in support.  This again

10  is what I would characterize as a standard motion in this

11  district to create a core service list and a master service list

12  of all parties who have requested notice and to authorize the

13  normal e-filing and e-service procedures, Your Honor.  And I

14  would ask that that be approved.

15          THE COURT:  Mr. Morrissey, is there any issue?

16          MR. MORRISSEY:  No issue, Your Honor.

17          THE COURT:  It's approved.

18          MR. RICHMAN:  Thank you, Your Honor.  Number 4 on the

19  agenda is another standard first day motion.  In order to have a

20  consolidated list of creditors using the debtor's electronic

21  information, rather than conforming strictly to the matrix

22  requirements of the rules, and to authorize the filing of a

23  consolidated list of top thirty creditors, paragraphs 36 to 39

24  of Mr. Mattes' declaration addressed this.  We also have set

25  forth proposed notice and hard copy and certain special cases

In re Atari, Inc. et al - 1/24/13                    43

1   which again is standard, including things like plan of

2   disclosure statement and first meeting of creditors and we've

3   reviewed that with Mr. Morrissey.  I don't believe there was any

4   objection.

5        MR. MORRISSEY:  That's correct, Your Honor.  There's

6   no objection but this is where the issue that the Court raised

7   earlier about perhaps some European creditors coming to the fork

8   come in.  This is the debtor's representation as to who the top

9   thirty creditors are.  And hopefully that list will not be

10  amended as we are in the process of soliciting for a committee.

11  But no objection to the relief sought.

12       MR. RICHMAN:  Well, Your Honor, I can represent that

13  in putting the list of creditors together, the U.S. debtors

14  referred to their records and claims against those entities.  If

15  there are French creditors who assert on the basis of claims

16  against French entities that they have claims against U.S.

17  entities, that probably would have to be dealt with through a

18  motion.

19       THE COURT:  I don't need to deal with that particular

20  issue on this procedural motion and the motion is approved.

21       MR. RICHMAN:  Thank you, Your Honor.  Item 5 on the

22  agenda is a motion to provide adequate assurance to utilities

23  and prevent them from discontinuing service.  Mr. Mattes'

24  declaration, paragraphs 55 to 58 addresses those issues in the

25  nature of the need for relief.

In re Atari, Inc. et al - 1/24/13                    44

1          It is interesting in this case that the kinds of

2    utilities that we usually see, electricity, gas and things like

3    that are all part of a triple net lease, so they're not even on

4    our list.  Instead, our critical vendors are internet service

5    providers and telephone service providers and the nature of the

6    business platform which is operated primarily out of New York is

7    such that if there were any interruption in those services, it

8    could cause huge damage to the business, given the internet base

9    that is used for so much of it.

10         And we have attached to the motion a proposal that

11   parties wanting adequate assurance can come and ask for a

12   deposit equivalent to what is reasonably expected for two weeks

13   of service and they have thirty days to request that in writing.

14   If they do request that, we will provide the deposit.  We have

15   the funds under the DIP if the DIP is approved to be able to do

16   that.  And that will be deemed adequate assurance.  Parties who

17   default or choose not to ask for adequate assurance within

18   thirty days will also be deemed to have been adequately assured

19   under the terms of the order.  And so, Your Honor, I would ask

20   that that be approved as well.

21         THE COURT:  Any issues?

22         MR. MORRISSEY:  Your Honor, generally, and Mr. Richman

23   and I had discussed this not today but earlier, it's not heard

24   on the first day of the case.  Mr. Richman said that this is a

25   special case because apparently someone has come calling on it.

In re Atari, Inc. et al - 1/24/13                    45

1    Usually what we recommend in a case like that is that

2 money be held in escrow for the benefit of that person to give

3 special assurance but the notion that it's not generally a first

4 day hearing is not a U.S. Trustee issue, it's more a court issue

5 and if the Court is willing to go forward with that today, the

6 U.S. Trustee has no objection.

7    THE COURT:  The part that I heard was no objection.

8 It's approved.

9    MR. RICHMAN:  Thank you, Your Honor.  Item 6 on the

10 agenda is a motion for approval of the debtor's existing cash

11 management system.  Mr. Mattes' declaration, paragraphs 48 to 54

12 describes the system and Mr. Partee also addressed and provided

13 a number of relevant facts in response to Your Honor's questions

14 earlier.  I think the important point for purposes of this

15 motion and what we're asking the Court to allow us to continue

16 is that since early December, the accounts have been kept

17 strictly within the United States with a box around them, with

18 strict accounting to make sure that there isn't any movement

19 across borders and that that can all be tracked and we're asking

20 for that to be continued.

21    And the one change we did make from the order that was

22 submitted to Your Honor is we have agreed with the U.S. Trustee

23 that we will stamp debtor-in-possession or DIP on our checks.

24 We had asked for relief from that but we have withdrawn that

25 request.  So, I would ask with that, that Your Honor -- we've

In re Atari, Inc. et al - 1/24/13                    46

1   also, I should make one other clarification, we decided after

2   discussion with the U.S. Trustee that we did not ask for a

3   waiver from Section 345 because what we were doing was in

4   compliance and we weren't -- we didn't want to suggest or imply

5   that we were trying prospectively to go around 345 or otherwise

6   get a waiver, so we've also withdrawn that request for a motion.

7   So with those changes, I would ask that that motion also be

8   approved, Your Honor.

9           THE COURT:  It's approved.

10          MR. RICHMAN:  Thank you, Your Honor.  Item number 7 on

11  the agenda is the motion to pay certain critical vendors.  Mr.

12  Mattes has addressed this in his declaration which I proffer at

13  paragraph 64 to 68.  There are, Your Honor, if I can describe

14  it, four different categories of parties that we are proposing

15  to pay under this motion.  There are game developers.  There's

16  American Express.  There's a warehouse that has a lien and is a

17  secured creditor and then there was a licensor, one of the most

18  valuable games that we have and that we make significant money

19  from.

20          It is not all the developers.  What we did was and I'm

21  going to describe this in a little more detail, we -- the

22  company's management had the greatest concern about business

23  interruption from small developers and foreign developers.  In

24  the case of relatively small developers, their work for Atari is

25  probably the only work they do.  And if they aren't paid, then

In re Atari, Inc. et al - 1/24/13                    47

1   they will go and take their skills to some other game platform.

2   The gaming development is planned far in advance of release date

3   and this is the lifeblood in the video game industry  because

4   you just don't put out a game.  You have to put out version 2

5   and then you put out version 3 and every time you put out a new

6   version, which hopefully ahs improved over the old one, you

7   capture new sales from all the people who loved version 1 and

8   version 2 and then you pick up new customers.

9        So, it's very, very important in the company's

10  ordinary course of business to keep that development business

11  into the supply chain and into the product chain going and the

12  damage -- if we have a developer of one of our major games walk

13  because they don't understand United States law or because they

14  are small and they can't afford to go without the payment and

15  the payments by and large to each of the individuals is not

16  tremendous but if they walk, then we can't -- there isn't

17  somebody that we can just open the yellow pages and find a

18  replacement developer for.  These are almost like utilities in a

19  sense.  They are really unique and when you find somebody who is

20  good and they're locked into your system, you don't want to lose

21  them.

22       So, that's why the developers are so important and

23  management's opinion was that the developers that are on the

24  list that is part of the motion would be likely to leave and

25  take their services elsewhere and that this could cause

1   significant damage to the business and particularly to the value

2   of the games that are licensed and in the market.  Improvements

3   on several of the games are already in the works.  I believe

4   that's in the first day declaration.

5         The warehouse lien, the warehouse in particular, has a

6   lot of our inventory and product and we can't afford to get

7   involved in lift stay litigation with them over their lien and

8   we don't think there are any issues with their liens.  So we

9   just propose to pay them to make sure that there's no

10  interruption in shipments and product flow through that

11  warehouse.

12        In the case of American Express, we don't believe that

13  we can compel American Express to continue to provide their

14  services if they aren't paid and they aren't only significant in

15  the sense that there's a particular employee who -- employees

16  have American Express cards and then they become -- they get

17  reimbursed by the company when they incur expenses.  So if the

18  card services are cut off and we can't pay them, those employees

19  could be liable.

20        In addition to that, we have a number of significant

21  parties that we do business with who will only take payment

22  through American Express.  They won't accept checks.  They won't

23  accept other forms of payments.  So if we don't pay the American

24  Express bill again, that could lead and management was concerned

25  that that could lead to not only negative impact on certain

In re Atari, Inc. et al - 1/24/13                    49

1    employees but to business interruption which could damage the

2    brand.

3            Lastly, in the critical vendor motion, there's a

4    licensor, Chris Sawyer (ph.), who is I guess the mastermind

5    behind Roller Coaster Tycoon which may be the most valuable

6    franchise of Atari and this is a license -- and by the way, I

7    should mention in the case of all the developers, many of them

8    are operating under executory contracts that most likely we

9    would assume in any event.  So, these critical vendor payments

10   would be paid in any event as cures when we get to the point of

11   assuming them.

12           Same is true for Chris Sawyer.  There's no question

13   that we would assume the Roller Coaster Tycoon license, given

14   its value and its conceivable that any purchaser wouldn't also

15   wish to have that contract assumed.  And we can't afford to have

16   him walk and -- or interrupt the support of that gaming

17   platform.  It's very, very valuable to us.

18           So that's the -- that is both my summary and proffer

19   and I believe that if Mr. Mattes were called would testify to

20   everything that I just said, as well as what's in his

21   declaration and with that, Your Honor, I would respectfully

22   request that the motion be approved.

23           THE COURT:  Let me just ask you this.  The Blue Bay

24   objection which is not being pressed, nonetheless has been read

25   and so, I am conscious of what argument was being presented last

1   evening and I would like you to deal with it, even though it's

2   not being prosecuted right now because part of what I read was

3   these may be payments that are appropriate critical vendor

4   payments to make but this is the first day of the case.  And

5   what's showing is there through your proffer from Mr. Mattes

6   that if this relief isn't granted today, that there will be the

7   kind of negative consequences you've described in your

8   presentation and I understand that small developers may go

9   elsewhere but they can also get an e-mail that says we're going

10  to pay you in three weeks.  And that's true for the warehouse

11  and that's true even for AmEx because AmEx while tough, doesn't

12  generally close the operations of a cardholder down because of a

13  twenty-one day late payment.  And we don't even know if the

14  payment's late yet.

15           And I don't know anything about Mr. Sawyer except he's

16  your number one unsecured creditor at 250,000 dollars --

17           MR. RICHMAN:  And he --

18           THE COURT:  -- and I assume that there's an ongoing

19  and close working relationship with him.  I'm assuming without

20  knowing this to be true that he's a reasonably sophisticated

21  gentleman.  I think there's a U.K. address but I am not

22  positive.  And that Mr. Sawyer could be told look, we went to

23  the mat on the first day of the case but there's this

24  requirement that the law has imposed that there be adequate

25  notice at the beginning of bankruptcy cases when significant

In re Atari, Inc. et al - 1/24/13                    51

1   payments are leaving the company and even though we had the

2   money to pay you, you're going to have to wait a few weeks.  I

3   hope you'll understand.

4        I guess my question is this; if such a rational

5   presentation were made to these various creditors, it's only

6   three weeks, gentlemen, be a little patient.  You're still

7   getting money ahead of everybody else in the case.  Why isn't

8   that sufficient?  Why do we have to do this today?  That's

9   effectively what the Blue Bay objection was addressing and

10  frankly, I think it's just something you need to meet in order

11  to get over that hurdle.

12       MR. RICHMAN:  I appreciate the comments, Your Honor,

13  and I'm going to respond and then I would also like a minute to

14  talk with Mr. Mattes about this issue to see if there's

15  information that we should supplement.

16       THE COURT:  Do you know what I think may make some

17  sense?  Why don't we take a five minute break.  We'll -- you can

18  stretch until say noon and come back right about -- at high

19  noon, how's that?

20       MR. RICHMAN:  Thank you, Your Honor.

21       THE COURT:  Okay.

22       MR. PARTEE:  Thank you, Your Honor.

23       (Court recessed at 11:53 a.m. until 12:03 p.m.)

24       THE COURT:  Be seated, please.

25       MR. RICHMAN:  Your Honor, thank you.  The break was

In re Atari, Inc. et al - 1/24/13                    52

1   productive because I was able to review Your Honor's questions

2   with management and management believes that they can try to

3   work persuasively with Mr. Sawyer and try to persuade him to

4   waive the twenty-one days, so that there can be a longer notice

5   period and that we could request the relief be granted at that

6   time.  And that cuts the relief we're seeking in half because he

7   was the largest payment on the list of about 250,000 dollars.

8            THE COURT:  Right.

9            MR. RICHMAN:  I want to offer Your Honor some

10  additional facts that would also be testified to that I learned

11  during the break about some of the other situations -- all the

12  other situations.  Amex is tricky.  It turns out it's just one

13  employee who has the card and it's in that employee's personal

14  name and the concern that management has expressed is the

15  difficulty of actually getting a decision maker at AmEx before

16  the bureaucracy just shuts you off.  And then that employee is

17  on the hook for that amount and it reflects on his personal

18  credit and it also impairs the ability of the company to make a

19  number of payments and to keep the business going.  So --

20           THE COURT:  Do you know where you are in the billing

21  cycle for that particular account?

22           MR. RICHMAN:  I believe it's overdue in about 40,000

23  dollars.  Can somebody help me with that?  Yes?  And when is the

24  bill due?

25           UNIDENTIFIED SPEAKER:  I do not recall.  I do not know

1   that.

2          MR. RICHMAN:  Okay.  But it's already one that's

3   overdue though; correct?

4          UNIDENTIFIED SPEAKER:  It's overdue.

5          MR. RICHMAN:  Yes, so that there is a roughly 40,000

6   bill that's already overdue.

7          THE COURT:  If it's overdue, that bill should be paid.

8   The individual's credit rating should not be affected.

9          MR. RICHMAN:  Thank you, Your Honor.  In the case of

10  the warehouse Symram (ph.), they have already put a hold on

11  shipments, I am told by management.  So, if the relief isn't

12  granted today to pay them their overdue amount, we would have to

13  bring a motion and bring other litigation against them which I

14  submit, Your Honor, on a cost-benefit basis given their secured

15  status, would be a waste of estate resources and on that basis,

16  I would renew my request that that payment be made.

17         THE COURT:  I think that's distinguishable in part

18  because of the lien and so, I have no problem with what you've

19  just said.

20         MR. RICHMAN:  Thank you, Your Honor.  Lastly, we have

21  the four developers that I mentioned and I was told that three

22  of them are located abroad including one in Lithuania, which is

23  the principal developer for Roller Coaster Tycoon, which is one

24  of the most valuable game franchises.

25             And management reiterated to me and they would also

In re Atari, Inc. et al - 1/24/13                    54

1   testify that they made significant efforts to try to winnow down

2   their list of all game developers, there were roughly ten, to

3   those that they really felt created the greatest risk and they

4   have a sincere and good faith concern that these four are the

5   greatest risk of interrupting and some are right now working on

6   significant license amendments and improvements to games, so

7   that if there's an interruption and then one doesn't know if you

8   can get that person back, if they haven't gone somewhere else,

9   and even if you can get them back, the delay impairs the value

10  of the ongoing franchises.

11          So, Your Honor, I would request that with respect to

12  those four developers, that I would renew the request that hose

13  payments be permitted to be made today.

14          THE COURT:  I accept that representation and with the

15  understanding that the request for first day relief as to the

16  payment due to Mr. Sawyer has been withdrawn, the other requests

17  are granted.

18          MR. RICHMAN:  Thank you, Your Honor.  And what we'll

19  do with Mr. Sawyer is we'll make that part of -- I suppose we'll

20  file a new motion for payment after twenty-one days, so that the

21  record is clear.

22          THE COURT:  I think you can simply carry that portion

23  of the motion to the next hearing date and I haven't done the

24  math but we were thinking that we could have a hearing on

25  February 14th at 10 a.m.

In re Atari, Inc. et al - 1/24/13                    55

1          MR. RICHMAN:  That would work, Your Honor.  Thank you.

2          MR. PARTEE:  That's consistent with our schedule, Your

3     Honor, yes.

4          MR. RICHMAN:  And it's also helpful to us to be able

5     to tell Mr. Sawyer that we have set that for a firm date, as

6     well.  So, thank you.

7          THE COURT:  And we can approve that payment at that

8     time and I am assuming that that will be a date well after the

9     appointment of the creditors committee.

10         MR. MORRISSEY:  Your Honor, I expect that that is

11    correct.

12         THE COURT:  Fine.  That would also be a date for the

13    final DIP hearing and for any other matters that are being

14    carried forward.

15         MR. RICHMAN:  Thank you, Your Honor.  We're good with

16    that.

17         THE COURT:  You could also conveniently use that as a

18    target date for your professional retentions.

19         MR. RICHMAN:  Thank you, Your Honor.  Before I move to

20    the next motion, just a small housekeeping matter.  During the

21    break, I also learned that in the notice procedures motion that

22    we submitted and the order, we had proposed that the core list

23    -- the smallest notice list include Blue Bay and in light of the

24    fact that their claim has now been sold, we don't think we need

25    to add them to the core list any longer.  So, I just wanted to

In re Atari, Inc. et al - 1/24/13                      56

1   make Your Honor aware of that and we'll take that out of the

2   order.

3            THE COURT:  Fine.

4            MR. RICHMAN:  Continuing with the agenda to item

5   number 8, Your Honor, is a motion to approve insurance premium

6   finance agreement and payment that needs to be made.  As

7   explained in the Mattes' declaration at paragraphs 62 to 63, and

8   in the motion, the company has an arrangement with an outside

9   company called Premium Assignment Corporation where the Premium

10  Assignment Corporation takes care of their insurance premiums

11  and finances them under a financing agreement and the company

12  pays a monthly amount, so that helps the company's cash flow.

13  And the next payment is due January 31, I believe, in the motion

14  and if it's not paid, then the financing agreement can be

15  terminated and it's not executory, so we can't assume it and

16  compel performance with it.  It covers workers compensation, so

17  it's a very important policy that we're legally required to

18  maintaining.  So we would ask that that motion be approved, so

19  the premium can be paid.

20           THE COURT:  Is there any problem with that, Mr.

21  Morrissey?

22           MR. MORRISSEY:  No problem, Your Honor.

23           THE COURT:  It's approved.

24           MR. RICHMAN:  Thank you, Your Honor.  The last agenda

25  motion apart from the interim DIP which the Court has already

1    heard, is a motion to pay prepetition wages to employees and all

2    under the priority cap under the Bankruptcy Code.

3            What I want to emphasize to the Court on this is that

4    the employment base for Atari is relatively small.  There are

5    only forty-seven full-time employees and one part-time employee

6    and just as the stability of the gaming platform and the

7    development flow into that platform is vitally important, we

8    also think that given the small size of the employment base

9    here, that we do not want to risk losing anybody in that

10   employment base at this critical time, particularly as we look

11   at the potential for a sale.  Having people not going through a

12   revolving door, potentially interrupting other services could be

13   damaging to the company.  And so, we're asking that only several

14   days' worth of unpaid but accrued wages and expenses be

15   reimbursed.  This includes two independent contractors who work

16   virtually full-time at the company and are kind of like critical

17   vendors.  One does product development and the other graphic

18   design, which are very key to the games.

19           Now we did discuss this with Mr. Morrissey who had a

20   concern about the expense component that we were asking about

21   and also asked about payments to insiders and this motion does

22   include payments to officers of the company, again under the

23   cap.  So, I want to be clear about that on the record.  But Mr.

24   Morrissey did request that we make this an interim order such

25   that all the payments that we've requested could be paid today

In re Atari, Inc. et al - 1/24/13                      58

1    but it would be subject to final approval in the event that the

2    trustee or committee or anybody else wants to have a closer look

3    at any of the numbers, including the expense numbers and we're

4    certainly prepared to discuss that with anybody who requests it

5    and come back at the final hearing if there's a need to do that.

6            So I would request respectfully, Your Honor, that this

7    be approved on an interim basis, so payments can be made

8    immediately in accordance with the motion but that we also set

9    it for final hearing.

10           THE COURT:  It's approved on an interim basis and

11   we'll hear it finally on February 14th.

12           MR. RICHMAN:  Thank you, Your Honor.  With that, I

13   believe we've concluded the agenda and unless Your Honor --

14           THE COURT:  One question, I noticed that there was an

15   application to formally retain your claims agent.  I would have

16   expected it to be on this morning's agenda.  Was that an

17   oversight or do you intend to simply heard at the same time that

18   other professional retentions will be heard?

19           MR. RICHMAN:  We intended it to be heard with the

20   other professional applications as part of a second day agenda.

21           THE COURT:  Okay.  Fine.  I guess with that, we're

22   done.  Thank you.  I'll see you next time.

23           ALL COUNSEL:  Thank you, Your Honor.

24                        - o0o -

25

59

1                           CERTIFICATION

2

3         I, Linda Ferrara, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter.

6

7    Dated:  January 25, 2013

8

9

10   _____

11                  Signature of Approved Transcriber

12

13

14

15

16

17

18

19

20

21

22

23

24

25